# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

CASSANDRA H.,[1]

                                        Plaintiff,

    v.

                                          8:19-CV-226(ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

---

MARK A SCHNEIDER, ESQ., for Plaintiff
EMILY M. FISHMAN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 5).

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for Title II Disability Benefits and an application for Supplemental Security Income ("SSI") on March 22, 2016,[2] alleging disability

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only his first name and last initial.

[2] The applications are dated April 22, 2016, and there is no indication that plaintiff filed "protectively" prior to April 22, 2016. (*See* T. 254). However, the "Disability Determination Explanation," attached to the initial denial states that the applications were filed on March 22, 2016. (*See* T. 78, 100). The ALJ does not mention that plaintiff's application was "protectively filed." (T.

beginning March 22, 2016. (Administrative Transcript ("T") 33, 212-26, 227-41). The applications were denied initially on June 9, 2016. (T. 100, 101). Plaintiff requested a hearing, which was held on May 30, 2018, before Administrative Law Judge ("ALJ") Brian LeCours. (T. 48-77). In a decision dated June 19, 2018, the ALJ found that plaintiff was not disabled. (T. 33-41). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on January 18, 2019. (T. 1-5).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

---

33). The discrepancy is irrelevant to this court's decision.

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of

review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (". . .we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony. . ."). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff was 29 years old at the time of the ALJ's hearing. (T. 53). She lived in a home with her husband, two of her children, and "every other day, two of [her] husband's children." (T. 52). The children were ages six, nine, sixteen, and eighteen. (T. 53). Plaintiff graduated from high school and started her first semester of college in 2007, but had to quit school because she "lost" her transportation. (*Id.*) Plaintiff

4

testified that she worked part-time waitressing and bartending after her alleged onset date. (T. 54). She worked for two years in that position, but stopped working in December of 2016 because she could no longer perform the functions required of the job and needed too many people to help her lift, carry, and clean. (T. 54-55). The waitress/bartender position required plaintiff to lift up to 50 pounds, and she testified that she could not lift that much even when she started the job. (T. 55). Plaintiff also testified that she worked full-time at ARC during 2014 and part of 2015.[3] (*Id.*) Plaintiff's duties included lifting patients and moving them from their beds to wheelchairs.[4] (T. 56).

Plaintiff testified that she could not work because she could not be "around anybody with any kind of smell on them, like perfume, or smoke, or pollen, or dust." (*Id.*) These respiratory irritants "upset[]" her sinuses, causing her to blow her nose frequently, sneeze, or cough, making her "look very ill." (*Id.*) Plaintiff stated that she had to use her nebulizer very frequently. (*Id.*) She testified that morning was the most difficult time for her, when her breathing was "at its lowest." (T. 57). She had to "be on [her] nebulizer frequently in the morning" and could not lift or bend over because her sinuses were draining. (*Id.*)

During the day, plaintiff stated that she had to sit down, rest, and change her positions "very frequently." (*Id.*) She stated that she could not keep her windows open and could not go outside without "having to be on [her] nebulizer or [her] inhaler." (T.

---

[3] The ARC job overlapped with plaintiff's waitress job, and at one time, she was working two jobs. (T. 55-56).

[4] Plaintiff testified that she used a Hoyer Lift to assist her in this duty. (T. 56).

58).  Plaintiff stated that the rug in the foyer where the ALJ hearing was held "upset" her breathing, and that she had been coughing "nonstop" since she walked into the building. (*Id.*)  Plaintiff tried to stay indoors as much as she could, but she did have to open the door occasionally to let her dogs in and out. (*Id.*)  The pollen and dust in her driveway caused exacerbation of her allergies. (*Id.*)

Plaintiff testified that, when she was working, she would try to work as little in the afternoon as possible - "five, six hours." (T. 58).  Plaintiff stated that she had to use her nebulizer, and she would "go through tissues [and] toilet paper" very frequently. (*Id.*)  Plaintiff testified that her husband, or one of the other family members, did the grocery shopping so that she did not have to go out. (T. 60).  Plaintiff stated that, if she did go shopping, she would have a "set list," and she would always take her nebulizer or her inhaler in her pocket. (*Id.*)

Plaintiff stated that doing the laundry was difficult for her, and that she usually had her husband or her children do it, under her supervision. (T. 61).  She could stand and fold the laundry for a short time, but had to have the children lift and carry the basket. (*Id.*)  She did minimal household chores, and she had to leave the house when the vacuum was running because of the dust.  She did not have rugs in the house, but "[i]t's constant sweeping and vacuuming [] because we have two dogs and four children in and out of the house all the time." (*Id.*)  She could not use any cleaning chemicals. (*Id.*)  Plaintiff then stated that she also wore a dust mask for twenty or thirty minutes after any cleaning was done in the house, and that she had sheets over the furniture. (T. 62).  The dogs were not allowed on the furniture or in her bedroom. (*Id.*)

Plaintiff testified that she could walk up the six stairs from her driveway into her house. (T. 65). However, plaintiff stayed on the "mid-floor" of her home, and she could not carry anything up the stairs. (T. 66). Plaintiff stated that she only went up or down the stairs once or twice per day, otherwise, she would have to use her nebulizer or her inhaler. She stated that when she came to the hearing, she had to stop and catch her breath at the elevators. (*Id.*) Plaintiff also testified that she home-schooled her children because of the "school bugs" that they might bring home. (T. 68).

The ALJ also heard the testimony of VE Margaret Heck. (T. 71-76). The ALJ asked VE Heck to assume that a hypothetical individual had the ability to perform a range of light work, had the ability to occasionally operate "adult"[5] controls,[6] had the ability to stoop, kneel, crouch, crawl, and climb ropes and stairs. (T. 71-72). The individual would never be able to climb ladders, ropes, or scaffolds. (T. 72). She also "must avoid concentrated exposure to extremes of heat, cold, humidity, and wetness," and "must avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dust, and gases." (*Id.*)

Based on the stated RFC, the VE testified that plaintiff could not perform her former work because her former work was in the medium exertional category. (T. 72). The VE determined that plaintiff could perform other work in the national economy, in the light and sedentary categories. (T. 72-74). These jobs included counter attendant,

---

[5] The transcript notes that "adult" controls was "[phonetic]." (T. 71). The ALJ's decision corrects this error in the transcript. (T. 36). Plaintiff's RFC, as stated by the ALJ in his decision, includes the ability to "occasionally operate pedal controls . . . ." (*Id.*)

[6] This was a "bilateral limitation." (T. 71).

surveillance system monitor, call out operator, and telephone solicitor. (T. 73-74). However, if plaintiff would likely be "off-task" for 20 percent of the workday due to symptoms and/or the need for unscheduled breaks, that would "preclude all competitive employment" because employers will only tolerate an employee being off-task between 10 and 15 percent of the time. (T. 74).

The ALJ then asked the VE to discuss the limitation to "concentrated" exposure to extremes of temperature and pulmonary irritants. (T. 75).  The ALJ asked whether "the jobs [the VE] cited . . . have any exposure to those things?" (*Id.*)  The VE responded "[w]ell, I was looking for clean environments." (*Id.*)  The VE stated that "[t]he only one question for that might be the hostess, because [plaintiff] says that . . . it's the smell in a restaurant that sets her off, and so –" (*Id.*)  All the other jobs were "'clean environments,' to use your term." (*Id.*)

The plaintiff and the ALJ engaged in a detailed statement of the relevant medical facts in this case. (Pl.'s Br. at 2-15 (Dkt. No. 11); T. 37-39).  Rather than reciting this evidence at the outset, I will discuss the relevant details below, as necessary to address the issues raised by plaintiff, and with any changes or modifications noted in my decision.

## IV.   **ALJ's DECISION**

After finding that plaintiff met her insured status requirements through September 30, 2018, the ALJ found that plaintiff had not engaged in substantial gainful activity ("SGA") from her alleged onset date of March 22, 2016. (T. 35).  Although plaintiff worked after her onset date, the ALJ found that her work activity –

waitress/bartender – did not rise to the level of SGA. (T. 36).

At step two of the sequential evaluation, the ALJ found that plaintiff's asthma, rhinitis/sinusitis, degenerative disc disease, and left shoulder impairment were "severe." (T. 36). To the extent that the record showed some "mental health problems associated with an affective disorder," the ALJ found these impairments not severe. (*Id.*) At step three of the evaluation, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.*)

At step four, the ALJ found that plaintiff had the RFC to perform light work, except that plaintiff could only occasionally operate "pedal" controls (a bilateral limitation); occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. (T. 36). Plaintiff could never climb ladders, ropes, or scaffolds. Plaintiff should also avoid concentrated exposure to extremes of heat and cold and pulmonary irritants such as fumes, odors, dust, and gases. (*Id.*) In making this determination, the ALJ considered the medical and other evidence of record, indicating the weight that he afforded the treating and consulting physicians. (T. 37-39). The ALJ also considered plaintiff's activities during the period in question, including her activities during the time that she engaged in work below the SGA level. (T. 39).

The ALJ also found that, based on the above limitations, plaintiff could not perform her past relevant work ("PRW") because the demands of her PRW exceeded plaintiff's RFC. (T. 40). The ALJ then considered plaintiff's age, education, and transferability of job skills. (T. 40). The ALJ determined that if plaintiff could perform

the full-range of light work, the Medical Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2 would dictate a finding of "not disabled." (*Id.*) However, the ALJ found that plaintiff's ability to perform the full-range of light work was "impeded by additional limitations." To determine the extent that the plaintiff's additional limitations eroded the light, unskilled, occupational base, the ALJ relied on the testimony of VE Heck. Based on VE Heck's testimony, the ALJ found that, notwithstanding plaintiff's additional limitations, she would be able to perform the representative light occupations of office helper, hostess, counter attendant, and hotel greeter. (T. 41). The VE also found that plaintiff could perform the representative sedentary occupations of surveillance system monitor, a call out operator, and a telephone solicitor. (*Id.*) The ALJ, therefore, found that plaintiff was not disabled.

## V. ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1. Plaintiff did not receive effective representation from her non-attorney representative, and the ALJ failed to fully develop the record. (Pl.'s Br. at 17-19).

2. The ALJ erred in failing to give proper weight to the plaintiff's treating sources and in failing to credit the opinion of his own consultants. (Pl.'s Br. at 20-23).

3. Plaintiff does not have the RFC to perform light work, and she is disabled based on the combination of her impairments. (Pl.'s Br. at 23-29).

4. The ALJ erred as a matter of law in rejecting plaintiff's credibility. (Pl.'s Br. at 29-35).

5. Dr. Wassef's opinion does not support a conclusion that plaintiff can perform either light or sedentary work. (Pl.'s Br. at 35-36).

6.     The ALJ's has not fulfilled his burden at step five to show that there are a substantial number of jobs that plaintiff can perform. (Pl.'s Br. at 36-37).

Defendant argues that the Commissioner's decision should be affirmed because it is supported by substantial evidence and was based upon the correct application of legal principles. (Def.'s Br.) (Dkt. No. 12).

## VI.  Duty to Develop Record/Non-Attorney Representative: (Plaintiff's Point I)

### A.  Legal Standards

Because of the non-adversarial nature of a Social Security action, the ALJ has the duty to affirmatively develop the record. *Keys v. Berryhill*, No. 1:16-CV-00448, 2017 WL 4324689, at *2 (W.D.N.Y. Sept. 29, 2017) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).  In *Cruz v. Sullivan*, 912 F.2d 8 (2d Cir. 1990), the Second Circuit held that, in connection with the duty to develop the record, "when the ALJ rejects the findings of a treating physician because they were conclusory or not supported by specific clinical findings, he should direct a pro se claimant to obtain a more detailed statement from the treating physician." *Id.* at 12.  The ALJ's duty to develop the record applies to both pro se and represented parties, and is heightened in the case of pro se plaintiffs." *Lopez v. Comm'r of Soc. Sec.*, No. 17-CV-1504, 2018 WL 5634929, at *5, 2018 U.S. Dist. LEXIS 186600, at *11 (E.D.N.Y. Oct. 31, 2018). However, "[w]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d

Cir. 1996)).

## B. Application

In this case, plaintiff is now represented by counsel, who argues that Kimberly Wills, plaintiff's non-attorney representative at the ALJ hearing, was ineffective. In addition, plaintiff argues that because plaintiff's representative was ineffective, plaintiff must be treated as having been pro se at the hearing and therefore, the ALJ failed to adequately develop the record. The plaintiff also argues that the ALJ erred in failing to question plaintiff's representative at the hearing to determine whether she was "qualified" to represent plaintiff. Plaintiff's counsel has submitted, as part of his brief, treating source records that were not obtained by plaintiff's representative and were not part of the record below. (Pl.'s Br. "Addendum A").

Plaintiff's Addendum A consists of three reports from Dr. W. Bruce Bunn, a pulmonologist from Champlain Valley Physicians' Hospital ("CVPH") Pulmonology. (*Id.*) The reports are dated September 27, 2017, November 29, 2017, and June 20, 2018. (Pl.'s Addendum A at 1-15). The last report is dated December 31, 2014, written by Dr. Wajih Aksamawai Dit Arja, M.D. (Pl.'s Addendum at 15-17).

There are two issues before the court, one focusing on the effectiveness of the representation, and the other focusing on the ALJ's conduct. First, even if plaintiff's representative had been an attorney, there is no right to effective assistance of counsel in a Social Security action. *Fastiggi v. Comm'r of Soc. Sec.*, No. 11 CIV. 997, 2014 WL 1285125, at *5–6 (S.D.N.Y. Mar. 31, 2014) (citations omitted). The qualifications of a non-attorney representative are set forth in 20 C.F.R. § 404.1705 and 416.1505, are

very broad. The regulations state that a non-attorney representative must be "generally known to have good character and reputation," "is capable of giving valuable help to you in connection with your claim," is not "disqualified or suspended from acting as a representative" in dealings with Social Security, and is not "prohibited by any law from acting as a representative." *Id.* 20 C.F.R. 404.1705(b)(1)-(b)(4).

Plaintiff argues that the ALJ failed to ask Ms. Wills about her qualifications to act as representative "as required by 20 C.F.R. § 404.1705 and 416.1505." However, there is nothing in the regulations that requires that the ALJ make inquiry about the representative's qualifications on the record. Although counsel states that Ms. Wills failed to submit certain records and failed to cross-examine the VE, which counsel argues made her ineffective, there is no indication that she was not "qualified" or failed to meet the criteria under the regulations. In *Doner v. Comm'r of Social Security*, No. 8:16-CV-883, 2017 WL 3172419, at *2 (N.D.N.Y. July 25, 2017),[7] counsel made the same argument about the same non-attorney representative. In *Doner*, the court held that

> there is no support for Plaintiff's argument that 20 C.F.R. § 404.1705 requires the ALJ to inquire into Ms. Wills qualifications, as that regulation does not place any such affirmative burden on the ALJ to question non-attorney representatives about such matters, particularly where the Plaintiff and his non-attorney representative have provided affirmative proof that Plaintiff wanted Ms. Wills to act as his representative.

*Id.* 2017 WL 3172419, at *6 (citation omitted). In this case, there is no indication that

---

[7] Magistrate Judge Christian Hummel issued a Memorandum Decision and Order in *Doner* in accordance with 28 U.S.C. § 636(c) and the consent of the parties.

plaintiff did not wish Ms. Wills to represent her, and it was clear at the hearing that Ms. Wills is not an attorney. (T. 48). Although plaintiff's current attorney states that Ms. Wills is not "qualified," he does not explain what that means, nor does he state how Ms. Wills fails to meet the regulation's requirements, outlined above.[8] Thus, plaintiff's argument that she received "ineffective assistance" cannot succeed.

However, the issue of effective assistance is separate from the ALJ's duty to develop the record, whether or not plaintiff is represented. In this case, there were no "obvious gaps" in the record. At the beginning of the hearing, the ALJ discussed the completeness of the record. The ALJ noted that he had three medical source statements ("MSS") from treating physicians, but that the plaintiff had not seen two of those physicians for over one year prior to the issuance of the MSS. (T. 49-52). The ALJ was concerned that the physicians had not seen plaintiff for over one year, but they were providing "current" opinions of her functioning. (T. 50). There were no current records from the two physicians, Dr. Kent and Dr. Bartos because plaintiff stopped seeing Dr. Kent, and she had not seen Dr. Bartos for approximately one year. The ALJ already had all the records that existed from those two physicians.

The ALJ did notice that Otolaryngologist, Dr. Gary Landrigan, had seen plaintiff more recently - "[w]e have records from him at least through November 15 of 2017."

---

[8] In addition to arguing that the ALJ should have inquired as to Ms. Wills's qualifications on the record, counsel focuses upon Ms. Wills's failure to obtain certain records and her failure to cross-examine the VE as evidence that plaintiff was essentially "unrepresented." (Pl.'s Br. at 19). The court notes that Ms. Wills discussed the completeness of the record with the ALJ, questioned the plaintiff extensively regarding her abilities, her prior work, her daily activities, and her current condition. (T. 49-52, 57-58, 59-63, 64, 65-67). While Ms. Wills did not "cross-examine" the VE, counsel has not specified what questions Ms. Wills should have asked. Further examination of Ms. Wills performance is not required by the regulations or by case law.

(T. 50). While it is true that Dr. Landrigan's November 15, 2017 report stated that plaintiff "has transferred her allergy and asthma care to Dr. Bruce Bunn, CVPH," there is no date of examination by Dr. Bunn, and plaintiff never mentioned Dr. Bunn as a current physician at the time of the hearing.

The court also notes that only two of Dr. Bunn's reports would have existed at the time of the ALJ's hearing, his initial examination on September 27, 2017 and his November 25, 2017 report. The June 20, 2018 report was written the day after the ALJ's issued his decision on June 19, 2018. Clearly the ALJ may not be faulted for failing to obtain a report that was not yet written. *See Kelly v. Berryhill*, No. 19-CV-741, 2020 WL 565412, at *2 (E.D.N.Y. Feb. 5, 2020) (ALJ fulfilled his duty by asking plaintiff's attorney to obtain the relevant records).

Plaintiff has also submitted a report dated December 31, 2014, which is outside the relevant period and not written by Dr. Bunn.[9] (Pl.'s Br. Addendum at 15). With respect to Dr. Bunn's September and November 2017 reports, as stated above, plaintiff never mentioned Dr. Bunn as a treating physician. Dr. Bunn also worked at CVPH Pulmonology, and it was not clear from Dr. Landrigan's November 15, 2017 statement

---

[9] The report is written two years prior to plaintiff's onset date and is signed by Dr. Arja. This document is an office note, written as a follow-up to plaintiff's December 29, 2014, two-day hospital stay. The administrative transcript contains Dr. Arja's discharge summary, dated December 29, 2014, which indicates that the plaintiff will "follow-up with Dr. Arja on 12/31/14." (T. 501). The report was co-signed by Dr. Bunn. (*Id.*) The administrative transcript also contains all the relevant documents from the two-day hospitalization. (T. 496-99). The discharge summary states that plaintiff was admitted to the hospital with an asthma exacerbation, likely caused by mold exposure in her home. (T. 500). Plaintiff subsequently moved out of the home in question. In fact, the record submitted by plaintiff's counsel states that, upon discharge, she was doing "much better," plaintiff was advised not to return to the home, and told that she should stay with her relatives. This information was essentially included in the documents that do appear in the record. (T. 496-501). Thus, the failure to obtain this particular follow-up note was harmless.

that plaintiff had already seen Dr. Bunn. There were already various records from CVPH, and the ALJ specifically discussed the record at the beginning of the hearing to make sure that it was complete. (T. 49-52). It is unclear how the ALJ would have discovered that these additional records existed. Ms. Wills stated that there was an emergency room record outstanding, and she submitted it after the hearing.[10] (T. 49, 578-86).

In *Vay v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 267, 272-73 (W.D.N.Y. 2018), the court held that the ALJ fulfilled his obligation to develop the record, even in a pro se case, where there were no obvious gaps in the record, the ALJ asked plaintiff's mother to supply him with any additional evidence that she might possess which would establish her child's disability, and he held the record open after the hearing. As stated above, during the hearing in this case, the ALJ noted some perceived deficiencies in the record and discussed the lack of recent examination by some of plaintiff's treating physicians. Dr. Kent was no longer treating plaintiff at the time of the ALJ's hearing, and plaintiff's representative noted that plaintiff was not seeing Dr. Kent because she could not afford to do so. (T. 50). Plaintiff admitted that she had not seen Dr. Bartos for over one year, so there were no updated records for her to obtain.[11] (T. 51). The ALJ stated that Dr. Landrigan's last report was from four months prior to the hearing, and there was no indication that another physician saw plaintiff in the interim. The ALJ

---

[10] The emergency room record was unrelated to plaintiff's respiratory impairment. She went to the emergency room suffering from contact dermatitis due to cosmetics. (T. 578-86).

[11] The ALJ did have the 2018 check-box Pulmonary RFC evaluations from Dr. Bartos, Dr. Kent, and. Dr. Landrigan.

did not fail in his duty to develop the record.

However, even if the ALJ had erred in failing to discover and obtain Dr. Bunn's 2017 reports, any error would be harmless. The court may consider whether the ALJ would have reached the same outcome had he obtained and considered the treatment records. *See Martinez v. Comm'r of Soc. Sec.*, No. 17 Civ. 10253, 2019 WL 1236324, at *5 (S.D.N.Y. Mar. 18, 2019) (citing inter alia *Seltzer v. Comm'r of Soc. Sec.*, 07 Civ. 235 (CBA), 2007 WL 4561120, at *10 (E.D.N.Y. Dec. 18, 2007) ("[T]o the extent that an ALJ fails in her duty to develop the record . . ., the court can still affirm her decision if this error is deemed to be harmless.")).

Dr. Bunn's initial report was dated September 27, 2017. (Pl.'s Br. Addendum at 9). Plaintiff reported that she had lived in a house with black mold, which was causing serious problems, but that the house had been torn down. (*Id.*) Plaintiff told Dr. Bunn that she could not hold a job because of her asthma. (*Id.*) She also stated that her nasal congestion symptoms had improved significantly after she began receiving Nucala injections. (*Id.*) Her medications included nebulizer treatments every 4-6 hours as needed. (*Id.* at 10). Plaintiff stated that she used the nebulizer every four hours. (*Id.* at 11). Physical examination revealed no acute distress, diffuse expiratory wheezes, but no crackles or rhonchi were noted. (*Id.* at 12). There were no retractions or use of accessory muscles. (*Id.*) She was instructed to return in two months. (*Id.* at 13).

Dr. Bunn's November 29, 2017 report states that plaintiff had a recent exacerbation of her asthma requiring prednisone burst and taper, but that she was improved at that time. (Pl.'s Br. Addendum at 5). The doctor noted that plaintiff was

exercising by walking seven times per week. (*Id.* at 6). Examination showed clear breath sounds in all regions, and forced exhalation did not produce any wheezing. (*Id.* at 7). Spirometry pre and post-bronchodilator showed "mild obstructive respiratory defect improved only slightly after inhaled bronchodilator." (*Id.*) Postbronchodilator Forced Expiratory Volume ("FEV") "is within normal range at 81% of predicted." (*Id.*) The doctor recommended that she return to the office in three months. (*Id.* at 8). These reports contain many improved findings and did not contradict any of the reports/progress notes that were already in the record.

Plaintiff argues that the ALJ specifically noted that "[a]lso of significance is that the claimant has not treated regularly since November 2017." (Pl.'s Br. at 19, T. 39). Plaintiff implies that Dr. Bunn's reports would have changed the ALJ's finding. However, at the time the ALJ wrote his decision, his statement was completely correct even if he had seen Dr. Bunn's November 29, 2017 report.[12] According to the new records submitted by plaintiff, she did not see Dr. Bunn again until June 20, 2018, the day after the ALJ issued his decision. There still would have been no medical reports between November 2017, when Dr. Landrigan examined plaintiff, and the ALJ's decision on June 19, 2018. Thus, any error in failing to obtain the additional medical records was harmless.[13]

---

[12] As stated above, plaintiff saw Dr. Landrigan on November 15, 2017.

[13] The court must also point out that Dr. Bunn's June 20, 2018 report states that "[f]rom the standpoint of her asthma, it is generally stable." (Pl.'s Addendum at 1). Plaintiff was still experiencing some coughing and shortness of breath, and was having trouble doing her recommended 100 minutes of exercise on a weekly basis because of a runny nose. However, "[o]verall, she definitely notices better control of asthma symptoms with the use of Nucala," but she was still struggling to come off Prednisone altogether. (*Id.*)

For similar reasons, this court finds that the medical reports submitted by plaintiff's counsel do not constitute "new and material" evidence, supporting a remand for further consideration on that basis. A case may be remanded to the Commissioner for reconsideration based on new evidence first submitted to the district court if the plaintiff is able to show that the new evidence "is material and that there [wa]s good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). To carry this burden, a plaintiff must show that "(1) the proffered evidence is new and not merely cumulative of what is already in the record; (2) the proffered evidence is material, meaning that it is (a) relevant to his condition during the time period for which benefits were denied; (b) probative; and (c) reasonably likely to have influenced the Commissioner to decide his application differently; and (3) good cause exists for his failure to present the evidence earlier." *Mulrain v. Commissioner of Social Sec.*, 431 F. App'x 38, 39 (2d Cir. 2011).

As stated above, without discussing each of the above factors, this court finds that the evidence submitted by plaintiff would not likely have influenced the Commissioner to decide this case differently. In addition, the court notes that plaintiff's current counsel represented her before the Appeals Council. Plaintiff missed the deadline for filing her appeal to the Appeals Council, and her current attorney requested that plaintiff be allowed to file a late appeal. (T. 1, 7). Counsel's letter is dated November 13, 2018, but failed to include the new medical reports, the latest of which was dated June 20, 2018. There appears to be no good cause for the failure to present the evidence to the Commissioner earlier. Thus, the medical reports contained

in the plaintiff's "Addendum" would not be cause for remand based on "new and material" evidence.[14]   The court will now turn to plaintiff's arguments based on the existing record.

## VII.   RFC: (Plaintiff's Points II-V)

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d. Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v.*

---

[14] Plaintiff does not make this argument, but I have included possible bases for the consideration of the evidence.

*Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## 2. Weight of the Evidence/Treating Physician

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(d) and 416.927(d), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner,

the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

A treating source's opinion on the nature and severity of a claimant's impairments is entitled to controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" of the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). This is known as the "treating physician rule." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (citation omitted).

If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* at 95-96 (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error. *Id.* at 96. However, the error is harmless if a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id*.

### 3.    Evaluation of Symptoms

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[15] The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical

---

[15] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[16]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p). The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76. However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744

---

[16] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p. As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

(S.D.N.Y. 2018)). "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d at 1040).

## B. Application

In this case, plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ did not give appropriate weight to the opinions of plaintiff's treating physicians and to the Commissioner's own consultant, Dr. Nader Wassef, M.D. Plaintiff also contends that the ALJ erred in "rejecting plaintiff's credibility, and he failed to consider the combination of her impairments.

The ALJ had three "Pulmonary Residual Functional Capacity" ("PRFC") Questionnaires before him, arguably from treating physicians. (T. 572-73, 574-75, 576-77). The first PRFC was from plaintiff's "treating" primary care physician, Dr. Elizabeth Bartos; the second was from Dr. Gary Landrigan, the treating otolaryngologist; and the third from Dr. Edward Kent, an allergist who saw plaintiff approximately five times between April of 2016 until April of 2017 before her insurance stopped covering the visits, and she could no longer afford to see him.

Although Dr. Bartos is listed as plaintiff's primary care physician, she completed her PRFC on March 22, 2018, having examined plaintiff only once on April 17, 2015. (T. 466-68, 572-73). While plaintiff saw other providers in Dr. Bartos's practice, it does not appear that Dr. Bartos actually examined plaintiff on any day other than April 17, 2015. When the ALJ was discussing medical records at the hearing, it was agreed that "someone other than Bartos was treating her." (T. 51). In 2016, plaintiff saw

Physicians Assistant Peter Brengel and Family Nurse Practitioner, Rebecca Boon. (T. 450, 453, 456, 460). Plaintiff saw Dr. Bartos on April 17, 2015 for a sinus infection and asthma. (T. 466-68). Dr. Bartos noted that plaintiff had been hospitalized "recent[ly]" for three days due to asthma and had "recent" sinus surgery. (T. 466). Upon physical examination plaintiff looked a bit tired, had a tight cough, and was "mildly" ill appearing, and had rhonchi[17] in her lungs. (T. 468).

In her check-box PRFC, dated March 22, 2018, Dr. Bartos stated that plaintiff could lift and carry up to 20 pounds and frequently lift and carry up to ten pounds. (T. 572). She estimated that plaintiff would have an asthma attack every four to eight hours and would be incapacitated for four hours up to one day "during an average attack." (*Id.*) Dr. Bartos also checked the box stating that plaintiff would be absent from work about three times per month due to her impairments or their treatment. (*Id.*) Dr. Bartos checked boxes stating that plaintiff should avoid all exposure to extremes in temperature and various respiratory irritants. (T. 573). She stated that plaintiff could sit and stand for thirty minutes each, with a total of "about 2" hours sitting and "about 4" hours standing. (*Id.*) Dr. Bartos stated that plaintiff's other limitations included the necessity for frequent breaks during the day and access to an "outlet" so that she could use her nebulizer. She estimated that plaintiff had been functioning at this level for three years. (*Id.*)

Dr. Kent saw plaintiff's several times, and in his PRFC, he estimated that plaintiff could occasionally lift and carry up to 20 pounds and frequently lift and carry

---

[17] Rhonchi are rattling lung sounds.

up to 10 pounds. (T. 576). He estimated that plaintiff would have asthma attacks more than once per day and that she would be "incapacitated" for approximately two hours during an "average" attack. He stated that plaintiff would be absent more than three times per month due to her impairments or their treatment. (*Id.*) He also stated that plaintiff should avoid all exposure to extremes of temperature and several listed pulmonary irritants.[18] (T. 577). Dr. Kent estimated that plaintiff could sit and stand for 1-2 hours each. She could sit, stand/walk for a total of about 2 hours each total in an 8-hour day. (*Id.*)

The ALJ gave both Dr. Bartos and Dr. Kent "limited probative value because they lacked foundation, and they had not treated plaintiff recently. Thus, they were not up-to-date on plaintiff's limitations or abilities. (T. 38). The ALJ supported his analysis with substantial evidence. Even assuming that Dr. Bartos is a treating physician, under the *Estrella/Burgess* factors, the ALJ would have been justified in refusing to give the PRFC "controlling weight." Dr. Bartos saw plaintiff once in 2015 when she had a sinus infection, and none of the subsequent reports from the Lake Placid Health Center were even co-signed by this physician.[19] She is an internist and not a specialist in pulmonary medicine or allergies, and her one progress note, written in 2015, sheds no light on

---

[18] The court will discuss the issue of environmental limitations below.

[19] Plaintiff was seen for her pulmonary condition on January 21, 2016 by FNP Boon for a variety of complaints, including her asthma. (T. 460-66). On February 1, 2016 plaintiff was seen by PA Brengel. (T. 456-59). He stated that February 1, 2016 was his first encounter with the plaintiff. (T. 456). On February 9 and 10, 2016 plaintiff was seen by PA Brengel and FNP Boon. (T. 450-55). The transcript contains other records from the Lake Placid Health Center, but these records are not specifically related to plaintiff's pulmonary condition. (T. 432-45) (Tracey Viola, D.O. - plaintiff's shoulder problems).

plaintiff's functional abilities. The PRFC is dated March 22, 2018, almost three years after she last saw plaintiff according to the transcript. It was reasonable for the ALJ to determine that Dr. Bartos's opinion "lacked foundation" and was entitled to limited probative value.

Dr. Kent is an allergist. However, plaintiff only saw him from April 11, 2016 until April 20, 2017 because her insurance would not longer pay for her visits. Thus, when Dr. Kent completed his check-box PRFC form on April 5, 2018, he had not examined the plaintiff for almost one year and was no longer her physician at that time. The ALJ noted that Dr. Kent had seen plaintiff five times, but had not seen her in one year, and his progress notes "documented significant reversibility following spirometry."[20] (T. 38). There is also no indication in Dr. Kent's progress notes that he was assessing anything other than plaintiff's pulmonary condition. There is no reference to plaintiff's ability to sit, stand, or walk in any of the progress notes. In April of 2016, Dr. Kent reported that plaintiff's pulmonary function tests showed a moderate obstructive pattern, but there was "significant reversibility." (T. 433, 435). Dr. Kent noted the same results in June of 2016. (T. 516). On April 20, 2017, Dr. Kent noted that plaintiff had severe persistent asthma, despite frequent oral steroids, and he stated that pulmonary function testing showed a moderate obstructive pattern, but a reversibility assessment was not performed. (T. 525). Plaintiff had some chest wall discomfort, and she was a candidate for "Nucala," but that this medication was denied

---

[20] "Reversibility" indicates the improvement of lung function after drug-administration. Asthma: diagnosis and monitoring of asthma in adults, children and young people - Ch. 12 "Diagnosis: Bronchodilator reversibility," https://www.ncbi.nlm.nih.gov/books/NBK536615/

by insurance.[21] (*Id.*)

Dr. Landrigan completed the same check-box PRFC on March 30, 2018. (T. 574-75). Dr. Landrigan opined that plaintiff could lift less than 10 pounds occasionally and would be absent more than three times per month. (T. 574). He also stated that plaintiff would have "never constant" asthma attacks, but would be incapacitated "near constant" during an average attack. (*Id.*) He also stated that plaintiff should avoid all exposure to temperature extremes and various pulmonary irritants. (T. 575). However, he stated that he had "no idea" how long plaintiff could sit, stand, or walk. (*Id.*)

The ALJ stated that Dr. Landrigan's report was entitled to "reduced persuasiveness" because he stated that plaintiff had been functioning at the opined level of functioning "for greater than five years." The ALJ correctly noted that, during the five years prior to Dr. Landrigan's report, plaintiff worked two different jobs that involved much greater lifting and exposure to a variety of irritants. (T. 38). The ALJ also noted that plaintiff testified that she left her waitress job because she could not lift and carry, rather than due to respiratory problems. (T. 39, 54). Thus, the ALJ's decision not to afford controlling weight to the treating physicians' PRFC statements is supported by substantial evidence.

The ALJ gave significant weight to the consultative internal medicine opinion of

---

[21] The court notes that after plaintiff stopped seeing Dr. Kent, she was approved for Nucala. (T. 551). On November 15, 2017, Dr. Landrigan stated that plaintiff had four doses "to date," that it was "well tolerated," and that she reported a "clear nasal passage." On November 15, 2017, plaintiff had nasal endoscopy which showed "widely patent airway" bilaterally. (*Id.*) Thus, the ALJ was justified in giving Dr. Kent's assessment of plaintiff's abilities, made a year after he last examined her less weight because it is apparent that plaintiff's condition, and therefore functional abilities, could have changed in one year based upon new medication. It might have been different if Dr. Kent had written the PRFC while he was seeing the plaintiff.

Dr. Nader Wassef, who noted that plaintiff had significant improvement on spirometry, but also found that plaintiff should not be exposed to extremes in temperature, second-hand smoke, perfumes, chemicals, or any type of respiratory irritants. (T. 483). He also found that plaintiff had "moderate" limitation in standing, walking, climbing and descending stairs, bending, squatting, lifting, and operating foot controls. (*Id.*) The ALJ recognized that Dr. Wassef's opinion was "vague and provided in terms with little vocational relevance."

However, the ALJ looked to the "overall record," including the plaintiff's work activities during the post-onset period and her own reports of household activities. Under the regulations, plaintiff's daily activities are a factor the ALJ may properly consider. 20 C.F.R. § 404.1529(c)(3). *See Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (ALJ properly considered the plaintiff's varied daily activities in formulating the RFC); *Herrington v. Berryhill*, No. 3:18-CV-315, 2019 WL 1091385, at *7 (D. Conn. Mar. 8, 2019) (activities of daily living, including childcare, are appropriate factors for an ALJ to consider when assessing a plaintiff's claimed symptoms and limitations). The ALJ found that, based on this analysis, Dr. Wassef's opinion was "representative of exertionally light [RFC]." (T. 39).

The court finds that the ALJ's decision in this regard is supported by substantial evidence. Dr. Landrigan was the treating physician who saw plaintiff most recently of the three physicians who submitted PRFCs. He stated that he had "no idea" how long plaintiff could sit, stand, or walk, and although his PRFC restricted plaintiff's lifting to up to 10 pounds, it is unclear how he made that decision when he stated that he had no

idea about plaintiff's other functional capabilities. It has also been held that a "moderate" restriction on an individual's functional abilities, as stated by Dr. Wassef, is consistent with an RFC for a full range of light work. *See White v. Comm'r of Soc. Sec.*, No. 8:17-CV-109, 2018 WL 2170288, at *8-9 (N.D.N.Y. May 18, 2018) (the moderate limitations as opined by Dr. Wassef are not inconsistent with an RFC for light work) (collecting cases), *aff'd*, 753 F. App'x 80, 82 (2d Cir. 2019); *Martinez v. Comm'r of Soc. Sec.*, No. 13 Civ. 159, 2016 WL 6885181, at *13 (S.D.N.Y. Oct. 5, 2016) (citations omitted), *Rep't-Rec. adopted*, 2016 WL 6884905 (S.D.N.Y. Nov. 21, 2016).

The medical records support this analysis. On April 27, 2016, plaintiff saw Tracey Viola, D.O. to follow up for shoulder pain, which was "better," but she still had some twinges. (T. 443). Dr. Viola's progress note stated that plaintiff had to go back to work. Plaintiff's shoulder pain had improved with an injection, and her strength was 5/5 though "painful." (T. 444). Dr. Viola released plaintiff to go back to work, on "light" duty, lifting no more than 20 pounds. (T. 445). By June 3, 2016 when plaintiff was examined by Dr. Wassef, she mentioned her shoulder problem and told Dr. individual that her treating provider told her not to lift overhead and not to lift more than 20 pounds.[22] Dr. Wassef's physical examination showed completely normal functional movement, full ranges of motion in all areas of the body, including her shoulder, full strength and dexterity. (T. 482-83).

The ALJ considered the medical evidence relating to plaintiff's physical impairment, noting both lumbar sprain/strain and a left shoulder impairment. (T. 37).

---

[22] Dr. Viola's report did not mention a restriction on lifting overhead. (T. 445). A twenty pound lifting limitation is consistent with light work. 20 C.F.R. § 404.1527(b).

The ALJ then stated that, among other findings, a "treating source"[23] found no weakness, numbness or tingling, full range of motion and good and equal strength. (*Id.*) The ALJ cited Dr. Wassef's opinion and correctly noted that he assessed "moderate limitations," and that there were no further records to indicate any ongoing treatment for these physical conditions. Thus, the ALJ's determination that plaintiff had the exertional RFC for light work is supported by substantial evidence in the record, notwithstanding Dr. Wassef's "vague" opinion.

Turning to plaintiff's environmental limitations, in his RFC determination, the ALJ found that plaintiff should avoid "***concentrated*** exposure to extremes of heat and cold and pulmonary irritants such as fumes, odors, dust, and gases." (T. 36) (emphasis added). Plaintiff argues that all the treating physicians found that she should avoid "***all***" exposure to extremes in temperature and humidity and "***all***" exposure to respiratory irritants such as solvents/cleaners, chemicals, soldering fluxes, cigarette smoke, perfumes, dust, fumes, and gases. (T. 573, 575, 577). The check-box form begins with "no restriction," "avoid concentrated exposure," "avoid moderate exposure," and ends with "avoid all exposure." (*Id.*) Plaintiff states that the opinions of her treating physicians are supported by Dr. Wassef, who stated that plaintiff should avoid "extremes in temperature, second-hand smoke, perfumes, chemicals, or any type of respiratory irritants." (Pl.'s Br. at 22, T. 483). Plaintiff also argues that the ALJ improperly rejected these opinions because the doctors were not seeing her at the time

---

[23] Although the ALJ does not name the treating source, it is clear that he is referring to Dr. Viola because the ALJ also states that the "treating source" did provide claimant with a work restriction of no lifting more than twenty pounds." (T. 37).

of the hearing. (Pl.'s Br. at 22).

Plaintiff's argument is not completely accurate. The ALJ first rejected Dr.
Bartos's opinion, not only because she had not seen plaintiff since 2015, but also
because she only treated plaintiff on "one" occasion. (T. 38). The ALJ gave Dr.
Landrigan's PRFC "reduced persuasiveness" because he opined that plaintiff's
environmental limitations had lasted at the same level for 5 years, but that during that
time, plaintiff was working at jobs in which she was exposed to "a number of solvents,
cleaners, smoke, and/or perfumes, in addition to requiring her to lift at least 10 pounds
or more." (T. 38-39). As stated above, the reduced weight that the ALJ gave Dr.
Landrigan's opinion is supported by substantial evidence. In addition, it is clear from
the ALJ's decision that he was considering the combination of plaintiff's impairments
when he discussed the weight that the was giving to the treating physician's reports.[24]

In any event, at the hearing, the ALJ began with a hypothetical question in which
plaintiff "must avoid concentrated exposure" to temperature extremes and pulmonary
irritants. (T. 72). However, after the VE discussed the possible light and sedentary jobs

---

[24] Plaintiff argues that the ALJ did not give sufficient weight to the opinion of the consultative psychologist, Carly Mount, who concluded that plaintiff had a "mild to moderate limitation appropriately dealing with stress because of her PTSD and depression." (Pl.'s Br. at 22). The ALJ discussed the "mention" of mental health problems. (T. 36). However, he correctly found that any mental health issues were "non-severe." The ALJ gave weight to the psychiatric consultant, Dr. Ochoa as well as Dr. Mount, in finding that there was no evidence that plaintiff's problems were "significant enough to interfere with the plaintiff's ability to function." (T. 36). Plaintiff was not treating for any mental health issues, Dr. Viola stated that her mental health was stable, and she did not require medication. (T. 443). Dr. Viola referred to plaintiff's mental health issues in the "Past Medical History" section of her progress notes. (*Id.*) Under the "psychiatric" section of plaintiff's examination, Dr Viola stated "Affect: appropriate. Mood: normal." (T. 444). Because the ALJ correctly found at step two of the sequential analysis that plaintiff's mental impairment did not affect the plaintiff's ability to function, there was no need to specifically discuss it later in the decision, notwithstanding the requirement that non-severe impairments be "considered" in later steps of the disability evaluation.

available to the plaintiff, the ALJ specifically revisited the respiratory restrictions. (T. 75). The ALJ stated that his first hypothetical restricted plaintiff only to "concentrated exposure," but then asked the VE "would the jobs you cited, would they have any exposure to those things?" (*Id.*) The VE responded that "[w]ell, I was looking for clean environments," and that the only job she mentioned in which there might be a "question" was the hostess job because plaintiff alleged that the smell in a restaurant might "set her off." (T. 75). Thus, even if the ALJ erred in determining that plaintiff should avoid only "concentrated" exposure, all but one of the jobs listed by the VE did not involve any exposure to pulmonary irritants. Any error would have been rendered harmless by the VE's answer to the ALJ's follow-up questions.

Plaintiff also argues that the ALJ erred in rejecting her "credibility." (Pl.'s Br. at 29-35). As stated above, the Commissioner no longer uses the term "credibility." Rather, the ALJ determines plaintiff's allegations for their consistency with the medical evidence together with the factors cited above. In this case, the ALJ outlined the factors to be considered and specifically noted that he had given these factors "full consideration." (T. 39).

In considering the relevant factors, the ALJ discussed plaintiff's activities. (*Id.*) He noted that since plaintiff's onset date, she worked as a waitress. Although this work did not rise to the level of SGA, the work "vouches for her abilities," lessening "the persuasiveness" of her claim that she could not be around any smells or had problems standing and walking. (*Id.*) The ALJ also discussed plaintiff's second job, which she held at the same time as the waitress job, and during which she was required to assist

residents with their activities of daily living. (*Id.*)  The ALJ also noted other activities of daily living, including home schooling her children,[25] going out to dinner, going bowling, and occasional gardening.  The court also notes that plaintiff testified that she has two dogs, and although they are not allowed in her bedroom, and must be "set apart in the house," they are allowed on the middle floor. (T. 61-62).  The ALJ concluded that given "the lack of medical evidence supporting the overall allegations," in addition to plaintiff's other activities, her statements were found to be "only somewhat consistent with the evidence." (*Id.*)  This includes her statements regarding her nebulizer use.

Plaintiff argues that the ALJ erred in failing to consider that plaintiff would be required to use her nebulizer throughout the day, rendering her unable to work. However, on plaintiff had surgery on September 16, 2016,[26] and when she returned to see Dr. Landrigan on October 21, 2016, he stated that "her asthma has remained excellent, requiring an albuterol inhaler x3 only versus q.i.d.[27] with nebulizer preoperatively in combination with maintenance steroid." (T. 537).  Dr. Landrigan stated that plaintiff had developed an upper respiratory infection which had progressed

---

[25] Plaintiff testified that she home schooled her children because she was afraid that they would bring home "school  bugs," and that this would cause her to become ill. (T. 68).  However, the fact that she is able to conduct home schooling for the children in addition to telling Dr. Wassef that she cooked, cleaned once per day, shopped, and took care of the children indicates greater activities than she claimed. (T. 481).  She told Dr. Mount that her asthma was very limiting, but that occasionally she went bowling, went out to McDonald's for dinner, and was trying to garden. (T. 476).

[26] Dr. Landrigan performed surgery on September 16, 2016. (T. 547-49).  Dr. Landrigan's surgical report states that various procedures were performed to open paranasal sinuses, remove diseased tissue and open all the sinuses to allow for topical steroid rinses." (T. 547).

[27] Q.I.D. is the abbreviation indicating four times per day. https://www.medicinenet.com/script/main/art.asp?articlekey=13561

to acute sinusitis . . . . Despite this there was no exacerbation of her asthma." (*Id.*)  In

his assessment, he stated that "Albuterol requirements are markedly reduced." (*Id.*)

Thus, the ALJ's failure to mention plaintiff's nebulizer use in the RFC was justified,

and the ALJ's analysis is supported by substantial evidence.

## VIII.   VE/NUMBER OF JOBS: (Plaintiff's Point VI)

### A.   Legal Standards

If a claimant is unable to perform a full range of a particular exertional category

of work, or the issue is whether a claimant's work skills are transferable to other jobs,

then the ALJ may utilize the services of a vocational expert.  20 C.F.R. §§ 404.1566,

416.966.  A vocational expert may provide testimony regarding the existence of jobs in

the national economy and whether a particular claimant may be able to perform any of

those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176,

180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilizes a VE at the hearing, generally, the VE is questioned using a

hypothetical question that incorporates plaintiff's limitations.  Although the ALJ is

initially responsible for determining the claimant's capabilities based on all the

evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a

hypothetical question that does not present the full extent of a claimant's impairments

cannot provide a sound basis for vocational expert testimony.  *See De Leon v. Sec'y of

Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F.

Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be

"substantial record evidence to support the assumption upon which the vocational

expert based [her] opinion." *Dumas*, 712 F.2d at 1554. *See also Peatman v. Astrue*, No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas,* 712 F.2d at 1553-54).

### B. Application

Plaintiff argues that the Commissioner did not meet her burden of showing that there are a "substantial number" of jobs that plaintiff could perform. (Pl.'s Br. at 36-37). Plaintiff argues that Office Helper (3,682 jobs nationally), hostess (6,033 jobs nationally), surveillance system monitor (6,375 jobs nationally), and callout operator (5,876 jobs nationally) are not "significant numbers" under the "law of the Northern District of New York." (Pl.'s Br. at 37). Courts have held that a "significant number" of jobs is "fairly minimal." *Rosa v. Colvin*, No. 3:12-CV-170, 2013 WL 1292145, at *9 (N.D.N.Y. March 27, 2013) (citing *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009)). In *Bavaro v. Astrue*, the Second Circuit held that the Commissioner need only show "one" job existing in the national economy that plaintiff could perform. *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011).

In this case, the ALJ cited both light and sedentary jobs that the plaintiff could perform, and although plaintiff's counsel cites four of those jobs and argues that they do not exist in "significant numbers," the ALJ also cited the job of "counter attendant," of which there are 50,690 jobs nationally, hotel greeter (25,752 jobs nationally), and

telephone solicitor (148,942 jobs nationally). (T. 41).  Plaintiff does not question that these jobs exist in significant numbers, but argues that she cannot perform these jobs because she cannot be exposed to any respiratory irritants.  However, as stated above, the VE testified that the jobs she mentioned would not involve exposure to respiratory irritants.  Thus, plaintiff's argument cannot succeed even if this court were to find that the ALJ erred in his RFC determination.

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED**, that the decision of the Commissioner is **AFFIRMED** and this case **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: March 10, 2020

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**